All right, we will now hear argument in United States v. Jenkins and Gentry. We have a related forfeiture appeal as well. I assume we're going to start first on the criminal, the underlying criminal case. Yes, Judge, for the record, Phil Hantel on behalf of Randy Jenkins. I guess I've been elected to go first on this. I think what we decided to do was to do five minutes for everybody, reserving five-minute cumulative rebuttal time. I know I only have a couple of things to talk about probably, so I may not use my five minutes, and I certainly would give that to the other people that maybe have more other things to talk about. All right. In the interest of – hang on. Theresa, go ahead and reset the clock to 20 since we just used up the first minute talking about logistics. Okay. Go ahead, Mr. Hantel. Judge, in the interest of efficiency, I certainly would welcome any direction as to what you wanted me to talk about. I had sort of prepared for the first two arguments that I laid out in my papers, and that would be the statute of limitations issues, and the second would be the materiality issues relative to the Internet chat room. I think for my purposes, and I don't mean to speak for my two colleagues since we haven't talked amongst one another yet, I'd like to hear particularly about the statute of limitation challenge. I don't need as much help on the materiality. Got it. Relative to the statute of limitations, I've tried to lay out in my papers that there were – here there were obviously three applications extending the statute of limitations because the government or the investigators were trying to obtain various and sundry records from Canada. Obviously, we can all – And the case law seems to suggest that the statute begins to run at the time that the – or the suspension seems to run at the time that the request is made. Are you challenging that case law? I am not, Judge. Okay. I think that – I think that where the crux of the matter really, if we can put a fine point on it, I think the crux of the matter really comes down to the sworn affidavit that was not included, although there isn't law in this circuit that requires that. We certainly have the case out of – I believe it's the Eleventh Circuit that requires that. And I try to – We're ready for you. Does the clock then restart when you cure things? I think it must. And I think that what my argument was is that when we have, you know, this error, I don't know that you can relate it back because the Treanor case, I think, says that there needs to be significant evidence. And I was trying to equate that, I think, in our reply brief with something that we talk about when we talk about wiretaps or search warrants or those sorts of things that really target an individual's rights and needs that higher level of reliability when we're doing this. And I think when we're talking about a statute of limitations, it should fall under that same category of sort of a heightened, you know, we need sort of the sworn affidavit that says this is what we expect to find. The thing that's different about this is it's done pursuant to treaty. And the treaty doesn't specify the precise form that the request must make. And we have the papers that were submitted to Canada. We have a motion, as I understand it, from the Office of International Affairs, presented by the assistant U.S. attorney to the court. And it's a pretty technical argument. What you really want is you want a sworn declaration that sort of authenticates all of these papers as being the basis for our request. Have I got your argument right? Yeah, I think that's it. And I think that it goes sort of a step further in the sense that I think that the second issue that I had a problem with or I think that my client had a problem with relative to these things is the communication between counsel and the court. And I understand there were a number of different U.S. attorneys that were involved in the case and, you know, this person retires or whatever the situation is. But the problem is I think that the court, and especially when we talk about the second two applications, the June application and the November application, there had been progress made on obtaining those records from Canada, and that was never disclosed to the court. But the case law is pretty clear that it's the final act that ends the period of suspension, correct? Right. So the fact that they didn't, you know, tell the court, well, we got some but not all of the information, doesn't really have any impact on the statute of limitation question, does it? Well, I think that the second supplement actually went further than what they initially had asked for. And so that was my suggestion to the court was that the final act had occurred with the initial application, and then they started talking about the others. But I thought the last thing they got was essentially the certificate of authenticity, which is the foundation to admit all of this evidence at trial. Right. But then there was a second application that was made from after they discovered some other things in – No, I understand that the scope of their request changed, but the final action here was in essence the evidence that triggers the admissibility of the evidence at trial, which is the certificate that these are records that were producing in response to the MLAT request. Correct. And the case law seems to say that's the end date for the suspension. Correct, assuming that there are, in fact, records that have been produced. Initially, they got the response back, and we say that the time should have been told. When the initial response, and I forget what the date exactly was, but it's in my papers, there was a response, sorry, don't have the papers. Well, but that, as I understand it, was in part because of the success of the fraud scheme. Your clients had done such a good job of hiding their assets that it took the investigators a while to unravel it all. Well, that – I wasn't necessarily privy to that investigation, but I think that that is where my suggestion to the Court that there needs to be an additional sort of communication with the Court on what's going on would allow the Court, along with these affidavits and stuff, to put in a – make a judgment as to whether the statute of limitations should be extended based on the affidavit and based on the standards that we might apply in a wiretap, for instance. What new – I guess, what new evidence are you alleging was not presented that would have made a material difference in the district court's authorization to suspend the running of the statute? Well, I think the new evidence, of course, was – initially was the sworn affidavit that came after the fact in June, after the initial application. That we can't find anything. No, the affidavit from the officer or the investigating officer saying, hey, these are what we expect to find, and here's my affidavit, swearing to the fact that this is – this is how we know. But I read that affidavit to essentially mirror what was contained in the MLAT itself. And I would agree with you that was that, but it still was not sworn. And I think that that's where – Okay, so now we're getting back to whether or not it makes a difference or whether the Court can simply look at the request that the Government of Canada is relying on in responding to a treaty request. Right. But again, I think when we're extending those – that statute of limitations, I think it's a significant right that the defendant has, and then I think that it needs that at a level. But I'm trying – what I'm not understanding in your argument, I'm trying to understand what it is that the sworn declaration by the investigator adds to what's otherwise before the Court. I think it's the indicia of reliability that, in fact, this is significant evidence and reliable evidence like what was discussed in June. But isn't that inherent in invoking the provisions of the treaty? I mean, this is a pretty big deal for the United States to ask a foreign country for assistance in an international criminal investigation and to send RCMP officers and Toronto police detectives out, in essence serving as agents of the IRS and the FBI in conducting an international criminal investigation. I agree, and it is a big deal. And I think that what this would protect is the sort of ongoing – and I understand that the investigators may not respond, and I also understand I'm running out of time. Yeah, I agree. But it's an interesting issue. I mean, it's a fascinating question. My thinking is, is that what this is designed to protect, or what my argument is it's designed to protect is what happened in this case, is that this sort of thing goes on and on and on. And there are a number of reasons that that can happen, and that's where I think that – Well, it goes on and on and on for three years. Congress has said at the end of that three-year period, you're done. Correct, but I think that there could be a number of reasons that it would go on and on and on, one for each year. It would be, number one, that somebody isn't doing their job, and certainly we shouldn't allow the government to get the extended statute of limitations because somebody isn't doing their job. And, of course, the second would be because they can't find the records or somebody on the other side is not doing their job. And I think that that's why we get into – we need that heightened standard here that's reliable evidence and the communication with the court on this is what we're doing and this is why we need the extension. Okay. Thank you very much, Mr. Cantell. May it please the Court. My name is Daniel Drake, and I'm a lawyer in practice in Phoenix, Arizona, representing IHRA Gentry in this matter. And as Mr. Cantell had indicated, he's discussed some issues. I was going to discuss the sufficiency of the evidence with respect to the international money laundering and as to profits and then also the jury instructions on the money laundering. And if there were other issues the Court wished to take up, I could go there, too. First, with respect to the sufficiency of the evidence on the international money laundering, I guess a good place to begin is the fact that the IRS agent, who was the only one to testify on this particular issue, said that she didn't know whether Thompson Kernighan, one of the brokerage houses involved, had a bank account in New York, which would put money in the United States. And that occurs at page 2551 of the transcript. There are documents that suggest, and I believe establish, that there were bank accounts in the United States from which funds were transferred. Counsel, one of the problems with your argument is I understand that one of the exhibits introduced before the jury appears at ER 541, which is the chart reflecting the flow of money from the Thomas Kernighan accounts in Canada to the United States. And am I correct that that chart was introduced as evidence under Federal Rule of Evidence 1001, which in essence permits an agent to testify as to the summary of otherwise admissible evidence that underlies the chart so that in essence it becomes a chart of summary evidence? Yes. Okay. And isn't that what that is? It is. Yes, it is something put together by the agent. If the jury believed it, why isn't that sufficient under Rule 1001 for the jury to conclude that there was an impact on national and international commerce? Because as the documents show in this particular case, that particular summary was flawed, and the cross-examination established that. But given the jury's verdict of guilt on those substantive counts and the overall arching conspiracy count, don't we have to assume that the jury resolved that argument in the favor of the government and against your client? You do, and that's the standard of the way it's set up. And you're challenging sufficiency of the evidence, and my question is a fairly simple one. I mean, that chart alone is pretty hefty evidence of impact on international commerce, and assuming that the jury chose to credit it, isn't that the end of the inquiry as far as the appellate court is concerned? I don't think it is, and here's why. Okay. What the chart shows is more than what the witness was able to testify to, and I think what the chart shows is a series of transactions. Bear with me for a second on this. Okay, go ahead. As I told you, I'm from Phoenix, Arizona. I came here today because I got a notice from the court that told me I ought to be here. Assume for the moment that I was profits in Canada, not a lawyer from Phoenix, and you sent me a notice that said we want you to come talk to us in San Francisco. I would then travel from Phoenix to San Francisco. That would be the profits moving internationally. What we have here is a situation where there may have been a wire, there may have been a document sent to the Bank of Montreal or another bank in Canada, but the funds came from U.S. bank accounts. All that the chart shows is the sequence of what started. The jury heard testimony that the stock transactions were orchestrated through the Canadian brokerage houses, correct? Correct. So they sold the stock. Yes. And then the question that I think you're arguing is that the money that came from the sale of that stock never went to Canadian bank accounts, even though it was Canadian companies who were ordering the trades. Is that your argument? I think so, if I understand what you said correctly. In other words, the money was transferred out of an account here in the United States. It's not uncommon, and the evidence shows here, for example, that Standard Charter Bank had a Standard Charter Bank limited Jersey Island, Jersey Channel Island account at the bank in New York. And so what happens, that's a – But the problem I'm having with your argument, Mr. Drake, is that the order for the sale of the stock was placed in Canada, right? Right. And the question here is whether or not these stock transactions impacted international or national commerce. And why does the inquiry have to be limited to the flow of the money? Even if you're right, if the jury credits this chart and concludes that the stock transfer agent acted in Canada and the funds ultimately end up in Arizona, isn't that enough? I say no. I say what you have to have is you have to have the race, the property has to travel interstate. It's not wire – But there was testimony before the jury that Thomas Kernighan had various accounts opened in Canada in the names of the various nominees that Gentry and Jenkins provided to them, and that money was transferred out of and into accounts in Antigua and Canada. I mean, you're really sort of – it's almost a tracing argument that the government couldn't trace the precise money from all of the stock sales and prove definitively that the money came out of a Canadian or an Antiguan bank account. But the problem I have, and I'm going back to the summary chart, is under 1001, the jury could still credit the summary so long as the underlying records were otherwise admissible. But the point on this is that there weren't otherwise underlying records that were admissible. The documents, if you want to look at them, they're in the same volume of the excerpt at 562, 563. These are the advice of debits and credits and so on? Right. 565. But, I mean, I'm looking at 567, for example, and it's got a stamp, Global Bank of Commerce Limited, St. John's, Antigua. Right, and that's where the account had been opened up. Exactly. But if you then look at 573 – I'm sorry, page 575, excuse me. I think you just went – go ahead. What is 573? I don't have that one in front of me. Okay. What that shows is that the Swiss American Bank, which was the one in Antigua, has an account at ABN Ambro Bank in New York, New York. And they issued a check, which then was to pay TCS. So you've got a situation where funds are being drawn from an account in the United States. Okay. But it's only one – I guess the problem I'm having with your argument is that it's only one piece of the puzzle. And the puzzle, as shown on the summary chart, is a lot bigger, that these transactions aren't limited to just that leg of the transfer. Right. But what I'm suggesting you see in the transactions, in terms of the expenditures and so on, is a view of the way the ball got put into play from the order that you sent, setting this case for all argument, until I came here. All right? And what I'm saying is, had I been in California and you had sent a similar notice to me and I had come here, I would not have traveled in interstate commerce, if you will. But why can't the jury conclude from hearing the evidence that all these different accounts were opened in all these foreign locations, that stock was sold and the proceeds deposited in accounts, and that ultimately the money finds its way to Arizona, why isn't that sufficient under Jackson for us to conclude that a reasonable jury could find, on the basis of all of that evidence, that there was an effect on international commerce? The evidence, as you take it and as you put it together, as you have done, does not establish those facts. It is not sufficient to establish those facts. To a certain extent it is circumstantial, but it's always going to be. Even when you have a convoluted international monetary transaction involving multiple transfers through correspondent banks, absent a custodian from each one of the banks as the money passes through, explaining the significance of these documents, I think your argument would be that's never going to be sufficient. No. If they had called someone from the Harris Bank in New York or from the Standard Charter Bank or whatever it was in New York, those would have been fine. There would have been three basic witnesses to establish sufficiently for a jury to hang its hat and convict somebody. I see I've got very little time left. I'll stop. All right. Very good. Thank you. We'll hear from the government. May it please the Court, Alyssa Hart-Mahan for the United States. And I'll reserve some of my time for my colleague, Mr. Pixler, who will be handling the forfeiture appeal. I'll begin with the statute of limitations issue. Pull the mic up just a little. Thank you. I'll begin with the statute of limitations issue. And I first want to note that the facts of this case are very different from United States v. the 11th Circuit case, which held that the MLAT request by itself was insufficient to support the suspension of the statute of limitations. Here, the MLAT request contained a great deal of detail, included excerpts from tax returns, from stock transfer records, from press releases, from SEC filings, went into great detail about the reasons why the government believed that the evidence was in Canada. And the trainer court specifically noted that the MLAT request in that case included a vague paragraph detailing the evidence and that that was simply insufficient. Here, we have a very detailed MLAT request. And accordingly, because the MLAT request contained sufficient detail, it had the indicia of reliability to support the district court's decision to suspend the statute of limitations based solely on the MLAT request. Moreover, any error in the application was cured when the government filed the June 20th supplement, which was a sworn declaration. And I think it might be helpful if I clarified the timeline of all of the various filings and requests. So the original MLAT request to Canada was made on March 16, 2005. Less than a week later, the government filed its application for a suspension of the statute of limitations pursuant to 18 U.S.C. 3292, and that was on March 22, 2005. When would the statute of limitations have run apart from these extensions? What would the date be that we're working against? There were a number of counts. So the date for each count varies. I believe the first, the earliest count that would have run would have been in April of 2005, absent a suspension of the statute of limitations. So the government filed its application on March 22nd. On June 20th, prior to receiving any response from Canada, the United States filed its supplement, which was the sworn declaration of the IRS agent who had been investigating the case. So that occurred on June 20th. On June 27th, the government, the United States received its first response from Canada, which was not a dispositive response to the requests. The MLAT request, the original MLAT request had requested from Thompson, Kernaghan and Union Securities accounts linked to Jenkins, Gentry, their aliases, or a number of corporate nominees that are listed on page 11 of the MLAT request. The June 27th response, Canada responded that Thompson, Kernaghan had not found any accounts linked to the defendants or their aliases. However, they had located counts in the names of the corporate nominees that were included in the original request. But that in order to provide the United States with the corporate nominee records, an additional request would be necessary. So that was not a dispositive response, it was an interim response informing the United States that additional action would be required for the records to be provided. In July of 2005, Canada provided the Union Securities records for the Universal Dynamics account held at Union Securities. In September, the United States made a supplemental request to Canada for the corporate nominee accounts at Thompson, Kernaghan. And then in November, the district court informed the government that it had misplaced the June 20th supplement, which was the sworn declaration, and asked the United States to resubmit that. The United States did resubmit the same sworn declaration with a date in November. Now, we acknowledge that the declaration was not strictly accurate in November because it indicated that the United States, that the text of the declaration was the same as the document filed in June. In June... I mean, you're basically just providing them a duplicate original, if you will? Exactly. The only fact that had changed was that we had received response, we had received some responses from the Canadian government. So there was, even though the affidavit was dated in November, that was sort of an oversight that that had not been corrected. Well, I guess the question I was really asking was, is that November filing, is it intended to be broader? Were you expanding the scope? No, it was a duplicate. Okay, so basically you're just replacing something that the district court has mislaid. Right, which then, and then the June 20th supplement did turn up later, and it's in the record, you know, it's in the excerpt of record in this case. Then in April of 2006, we have the final response from the Canadian government where it provided the Thompson-Kernaghan records for the corporate nominees, including certification of those records. And so that's when the period of suspension ends. I would note that although the June 27, 2005 communication from Canada had indicated that there was no connection between Gentry, Jenkins, or their aliases, and the nominee accounts, in fact, when the records were provided, they revealed that Don Williams, which was one of Gentry's aliases, was in fact linked to both the prime security and the Mearns accounts, which were two of the nominee accounts at Thompson-Kernaghan. So I hope that's clarified matters somewhat. Unless if the Court, does the Court have further questions? Can somebody address Mr. Drake's argument? Yeah, I'll turn to that next. I just wanted to make sure. Yeah. Judge Rawlinson, any questions on the statute? No. Okay. So turning to the sufficiency of the evidence in the money laundering accounts, again, as the Court recognized in reviewing for sufficiency of the evidence, the evidence must be viewed in the light most favorable to the government. And the evidence is sufficient if it would support an inference by a rational trier of facts in favor of conviction. And to the ‑‑ Counsel. Yes. Are you relying on the testimony of the IRS agent? Not solely. The underlying documents are sufficient to support jurors' inference that the funds, in fact, moved from Canada and from Antigua to the United States. And as an example, I'm not sure if the Court has the excerpts of record in front of them, but page 578 of Gentry's excerpt of record is an example of one of the wire transaction reports that came from the Wells Fargo Bank in Arizona where the funds ended up. And there is a reference to Harris Bank International, which is located in New York, on this wire transaction. But there's also references to the Bank of Montreal, which is in Canada. And in the middle of the page, there's a reference to Thompson‑Kernaghan, which the evidence at trial established was a Canadian brokerage account where defendants kept their stock and where defendants sold their stock. And this document is sufficient to support the jury's inference that the funds did, in fact, move from Canada to the United States. I would also point the jury ‑‑ or point the Court, excuse me. Am I correct that the Thompson‑Kernaghan accounts show that money was deposited in those accounts at or about the time that the stock was sold, correct? Yes. The Thompson‑Kernaghan accounts show the sale of the stock. And deposit into the Canadian account. Yes. Yes. So the question is, how did the money get from Canada to Arizona? Right. And I would point the Court to, in the government's supplemental excerpt of record, the supplemental excerpt of record include a lot of the Thompson‑Kernaghan bank statements for the nominee entities. So, for example, if you look at page 131 of the supplemental excerpt of record, this is an example of a statement for one of the Thompson‑Kernaghan nominee accounts. And you'll note that on ‑‑ it shows, about the middle of the page, it shows a wire, it shows several wires made from the Thompson‑Kernaghan account in Canada to Wells Fargo Bank. That corresponds to the Wells Fargo Bank record showing the funds arriving in Arizona. This evidence is more than sufficient to support the jury's inference that the funds did, in fact, move internationally from abroad to the United States. And those are the underlying documents for the summary charts that I have. Yes. And if you'll note on the summary chart, for each transaction in the summary chart, there is a list of the corresponding exhibits. So the jury could, in fact, refer to those underlying documents when reviewing the summary chart and determining whether or not to credit the summary chart. Oh, that reminds me. I wanted to ask one of you. The jury had the indictment in the jury room during deliberations, did it not? Yes. Yes. I'd be happy to answer any other questions the Court has about any of the other issues. Oh, yes. And maybe this is for your co‑counsel. I'm interested in having you address which counts in the indictment were directly relevant to the civil forfeiture claim with regard to the purchase of the APA. I'm going to defer the forfeiture questions to my colleague. And if there are no further questions, we would ask the Court to affirm the judgments of the District Court in this case. Thank you, counsel. Mr. Pixler, let's see. I guess we'll hear first from Mr. Gentry. Mr. Gentry, are you with us? I am. I am. Very well. I know you don't have a clock in front of you, but I'll go ahead and give you 10 minutes to argue the forfeiture questions. All right. I was listening to the last of the series, and I wanted to thank the Court for the opportunity to be heard. And in the civil forfeiture case, I understand to date the only evidence filed by the government to support the claim has been the single, uncooperative affidavit of the IRS agent Linda Wallace. In the government's answering brief to my brief, each time the claims are stated, the support exclusively jumps to Gentry's or my criminal conviction and how I'm stopped from defending. And I bring to the Court's attention that the funds used to purchase Rez were not charged in the criminal conviction, and the earliest specific unlawful activity count in the criminal conviction was on April of 2000, and this was after the purchase of the Rez. The Ninth Circuit has held that because the criminal indictment and convictions were not obtained until after the institution of the forfeiture, proceeding they can't be used, and the termination of this forfeiture would rise or fall on the strength of the single, uncooperative affidavit. Mr. Gentry, let me interrupt you with a question. Yes. As I understand the theory of the forfeiture, the government is arguing that the conspiracy began sometime in 1997 and that there were similar stock sales after the stock price was inflated, which produced proceeds that were then transferred from Canadian accounts to Arizona and traced to the down payment and so on of the Arabian residents. Given the fact that the jury convicted you and your co-defendant of that conspiracy, why can't the court, the district court, properly look to the criminal conviction in applying the doctrine of collateral estoppel on the forfeiture claim? Okay, good question. 18 U.S.C. 371, as charged in the indictment, was to interfere with the functions of the IRS. And that's one of them. There are actually three purposes. One is the client conspiracy to interfere, but a third prong, as I read the indictment, was also to commit various acts of securities and wire fraud, and those were charged as objects of the conspiracy. Yes. I have the wire fraud and the SEC claims as actually, they're actually the first and the second claim in the civil complaint, which are covered. The only claim which isn't covered in the civil complaint, which may be used as somewhat of a res judicata, would be, in fact, the issue of interfering with the IRS and the function of the IRS, and that itself. No, Mr. Gentry, I don't think you understand my question. Okay. Let me see if I can rephrase it for you. The conspiracy count included allegations that one of the objects of the conspiracy was to engage in various acts of mail and securities fraud. Yes, sir. And there were sales of security earlier than the substantive wire and securities fraud counts charged in the indictment that the government alleges were generated, the proceeds that were used to purchase the race, and the jury had that evidence before it when it convicted you of the conspiracy going back to 1997. Why is that not sufficient as a matter of law to invoke the doctrine of collateral estoppel? Well, as I understand it, in the criminal conviction, every element of wire fraud and securities fraud was actually listed as one of the 59 counts, which began in April of 2000. And none of the funds and none of the transfers from union securities you'll find on the summary chart or as one of the issues of the indictable elements in the criminal conviction. There's no funds coming out of union securities. Didn't the jury hear evidence that there had been sales earlier than 2000? Actually, the jury and nor were there any counts in the criminal conviction, which involved the sale of stock. Mr. Gentry, it's a little difficult, I realize, but I don't know if you have the indictment before you or not. I do have it here. Okay. But the indictment does talk about the fact that there were sales earlier than the later what I'll call substantive counts, which are the standalone securities and wire fraud counts. And as I understand the government's theory is once we prove that there was a scheme and artifice to defraud that covered this broad period of time, then sales of stock that occurred earlier than 2000, even though they could not be charged as separate substantive criminal offenses, in the indictment could nonetheless be considered as evidence of the conspiracy, which you were convicted of. And if the government can trace the proceeds of monies from those earlier stock sales to the purchase of the residence, then they have made out a case for civil forfeiture. Yes. The sales of stock which were covered in the criminal conviction and in the criminal indictment that was talked about before the jury was actually in Thompson Kernaghan. There was no discussion regarding union securities. There was no evidence regarding union securities. And so the total criminal case focused upon the issues involving Thompson Kernaghan and activities that started in April of 2000 and onward. Let me ask you a question, Mr. Gentry. This is Judge Fletcher. Yes, ma'am. This was determined on summary judgment, and I think that you need to show us that there were material facts that were in dispute. Can you point to some of those? Well, I believe the summary judgment was rewarded because of res judicata because of the Thompson Kernaghan issues which got before the criminal court. And in the civil complaint, the funds and the stock sales which were done at union securities are a separate issue. In each of the claims, for instance, in the wire fraud claim, the statute of limitations is five years under 28 U.S.C. 2462. And evidence prior to 28 U.S.C. 2462 would not allow any types of activities prior to five years before the issuing of the criminal complaint. Well, that's not true with regard to conspiracy, though, Mr. Gentry. That would be true with regard to the separate standalone counts. But the five-year statute doesn't begin to run on a conspiracy until the last overt act in furtherance of the conspiracy. So the government can look back as early as 1997 in order to convict a person of a conspiracy that began more than five years ago. In the criminal complaint, there's no conspiracy. There's no claim of conspiracy. All right. Well, I'll tell you what. You've got about a minute and 45 seconds left. Would you like to save it for rebuttal so we can hear from the government, or do you want to continue? I'll go ahead and continue. The wire fraud complaint, prior to the CAFRA Act of 2000, wire fraud was not a forfeitable event. It did not qualify for civil forfeiture. And so the first claim under wire fraud would be dismissed as you can't do a wire fraud complaint with the activities of the res, which was purchased long before the action of CAFRA. Under the second claim, under SEC fraud, there's a two-year statute of limitations up to discovery, and it's undisputed that the government received all the records from Union Securities on December 12, 2001, and that they had two years from which to file any kind of securities claim. And that would include any claim on artificial stock fraud or artificial inflation. And there's also a five-year hard line on statute of repos, which gives the government two days to establish a claim on the res, where the res was purchased within two days of the five-year statute, but they're left with having to reach further up into five years, which is barred. And that's all I have to say. Thank you. All right. Very well. Thank you, Mr. Gentry. We'll now hear from the government. Mr. Pixler. Thank you. Please, the Court, I'm Reid Pixler, appearing for the United States with respect to the civil forfeiture provision of the case. There's simply no basis for any of the arguments contained in the brief at all in the opening brief from Mr. Gentry. Union Securities ---- Counsel? Yes. Did you specifically address the statute of limitation arguments? Okay. The two-year statute of limitations that he's referring to doesn't relate to a civil forfeiture case. There's a five-year statute of limitations cited in the brief. Statute of limitations would have expired three days after the filing of the complaint. However, even if there is anything that would cause the complaint to be beyond the statute of limitations, we cited a substantial amount of information that would cause the tolling of the statute of limitations. The civil forfeiture complaint did not violate the statute of limitations and was filed timely. Counsel, I was a bit puzzled by the government's request that the civil forfeiture case be taken off this calendar and perhaps counsel appointed for Mr. Gentry. What was the government's rationale at that time? The recent motion that was filed was on the basis that the chief of the appellate division wanted to bring to court's attention that Mr. Gentry was in custody and could not be appearing. So we thought it would be appropriate to remove it from the oral argument calendar. You didn't ask for appointment of counsel. I thought it was just submitted on the brief. That's correct. Yes. Okay. Can you also address, does Mr. Gentry have standing to even be here? No, Your Honor. That's an excellent question. The timeline is that the property was registered or titled in the name of a defunct corporation, Marriott Investments from Bahamas, that was a substantial amount of the early litigation. It did not appear. It was served. It had been found to be a non-functioning corporation in Bahamas. This is a Marriott Corporation? It's just a sound-alike name. It was spelled slightly differently. I think it had one T instead of two or something like that. So it wasn't a real corporation. It was a complete sham that Mr. Gentry and Mr. Jenkins created. It was defaulted. That title to the real estate was forfeited to the United States. All we're dealing with is Mr. Gentry's issue as to whether he has an ownership interest in the property. The summary judgment was ---- But wouldn't that be the subject of a separate petition in mitigation to the Attorney General for relief of the forfeiture? That would be appropriate. He could do that. But we also moved to forfeit it under summary judgment on the basis that he didn't claim an ownership interest. And that's one of the things that's lost during this entire appeal. The only issue that we were seeking was to determine whether Mr. Gentry had an ownership interest. He never claimed an ownership interest in the property. All he ever claimed was to have a possessory right with an option to purchase. And that right was terminated when the property was forfeited to the United States. Although he claims that that somehow by operation of law evolved into title in fee simple when the Bahamanian government dissolved the Marriott Corporation, correct? He believed that it created a resulting trust and asked to have the resulting trust joined. Judge Wake denied that motion. And then he sought to retrieve the deed, an unsigned or signed but undated deed from Marriott Corporation to himself that was in his possession at the time he was arrested under the indictment. When Judge Wake refused to give him that deed or order the deed returned, they tried to record a counterfeit deed or not a counterfeit, a photocopy. But that was after the civil forfeiture action had been filed and a notice of lease pendants and all that. It was actually after the interest of Marriott had been defaulted. So they did cloud the title of the United States. And in any event, by virtue of the criminal conviction, he would never be able to establish that he is an innocent owner who acquired an interest without any knowledge of the criminal behavior. That's absolutely correct. That's what Judge Bolton had ruled in her final order. Counsel? Go ahead, Judge Robinson. Wouldn't Mr. Gentry's assertion of a possessory interest give him standing? It would give him standing if he was claiming that he owned an interest in it or was acting for some other person. The mere possession of the real estate did not give him standing. It would be outside of the prudential standing requirements. If he claimed a possessory interest, you're saying that's not enough to give him standing? The way it was briefed, Your Honor, we weren't going to disturb his possession of the property. In fact, did not disturb his possession of the property. The possessory interest expired during the course of the litigation when the document… But my question was, at the onset of litigation, if he had a possessory interest in the race, would that give him standing to participate in the forfeiture proceedings? To the extent that it didn't disturb his possession of the property, yes, Your Honor. But his standing would arise to attack the forfeiture of the underlying property entitled in the name of Marriott Investments. He couldn't dispute the forfeiture of the property when Marriott was the title holder of the property. He had standing to contest his interest to keep the government from forfeiting his interest in the property. But, for example, if Marriott… I'm sorry? A great deal of this case was prosecuted on the premise that these were nominal corporations that were, in fact, his interest. So it seems a little ironic that at the point of the forfeiture, an opposite argument is made. Well, for the purposes of summary judgment, we took everything Mr. Gentry had alleged as true. That's exactly why we're in this sort of conundrum. I don't believe any part of Mr. Gentry's arguments were true. But we accepted them and submitted the summary judgment motion on that basis. And Mr. Gentry never disproved his false allegations. Now he's trying to go back and litigate the underlying issue as to whether the real estate should have been forfeited in the name of Marriott Investments. That he lacked standing to do at this point because he didn't even begin that process until that property was already forfeited and after he'd been convicted. So the argument now is substantially different than it was at the time Marriott Investments was forfeited. So is it the government's position that what we ought to do with the civil forfeiture appeal is simply dismiss it on grounds of standing rather than reach the merits? You can reach the merits, Your Honor. We've briefed it entirely. There are no merits to his appeal. Well, I understand that. But you did raise standing. And if you raise standing, we have an independent obligation to determine whether or not there's any relief that we can afford Mr. Gentry and whether he has a basis to seek such relief. The position, the basic, the first position the United States has always argued with respect to Mr. Gentry is he lacked standing to contest the forfeiture of the real estate of Marriott Investments. He had standing to litigate his issue concerning whether his interest should be forfeited, his possessory interest in the property. Right, and he lost that argument before Judge White. Yes. And that wasn't appeal, the forfeiture of the Marriott Investments. Now, in terms of the possessory interest, Mr. Gentry, that expired under its own terms when he, well, I don't know what he did. The terms required the payment of over a million dollars to the Marriott Investment by a specific date, certain. If that wasn't paid, his possessory interest expired. He didn't pay it. He was in custody at the time. He professes to have paid that by tendering stock certificates to Marriott Investments, which no longer existed after Judge Wake had ordered him to deal with the United States. So it's pretty clear that Mr. Gentry's entire position was simply built on a stack of cards. There's no basis for it at all. It expired. If he had a million dollars to actually fund the acquisition of the race, that could have been disclosed on his financial statement when he was appointed counsel, because he's been represented by counsel this entire time. I think the stock was worthless. I don't believe it ever transpired. But his term at this point in time has expired entirely. He didn't have standing to disturb the forfeiture of the underlying property. All right. I think we understand the respective positions of the parties. Both cases that were just argued are submitted and will be adjourned until tomorrow morning.
judges: Fletcher B. , Tallman, Rawlinson